The American Fork and Hoe Company v. Commissioner.
American Fork & Hoe Co. v. Commissioner
Docket Nos. 108334, 108503.
United States Tax Court
1943 Tax Ct. Memo LEXIS 107; 2 T.C.M. (CCH) 842; T.C.M. (RIA) 43431; September 22, 1943
*107 1. Basis for computation of depreciation allowance determined from the evidence. 2. In 1930 and during the first three months of 1931, petitioner sold axes to its jobber customers with a guarantee against subsequent reduction in price. On April 1, 1931, petitioner reduced its price on axes and thereby became liable to make rebates under its guaranty. It promptly requested its customers to report the number of axes in their respective invetories at the date of the price reduction. All of such reports were not received and the exact amount of petitioner's total liability was not ascertained until July 1931. Held, since the liability was definitely incurred and all facts had transpired to fix the amount of such liability within petitioner's fiscal year ended April 30, 1931, petitioner is entitled to accrue and deduct from gross income for that year the amount of rebates paid pursuant to its guaranty. 3. On the facts, held that certain shares of corporate stock owned by petitioner became worthless within the taxable year 1931, and petitioner is, therefore, entitled to deduct from gross income for that year the amount of its investment in such stock. 4. Held, petitioner *108 is not entitled to a credit against its United States income tax on account of foreign income taxes paid by the foreign subsidiaries of petitioner's wholly owned Canadian subsidiary. 5. On July 31, 1930, petitioner purchased all of the assets of another corporation, and as a part of the purchase price assumed all liabilities of the vendor, including a deficiency in Federal income tax then in controversy. Petitioner finally settled its liability by the payment of tax in the amount of $81,721.06 and interest in the amount of $40,483.75, all within its fiscal year ended April 30, 1934. Of the interest so paid, $21,723.25 was for the period prior to July 31, 1930, and the balance for the period subsequent to that date. Held, the interest for the period prior to July 31, 1930, was a part of the consideration paid by petitioner for the assets acquired on that date, and is not deductible from gross income by petitioner as interest paid. Held, further, the tax liability became petitioner's own obligation on the date last mentioned, and petitioner is entitled to deduct the interest paid for the period subsequent thereto. 6. Held, petitioner is entitled, under section 116(a)(12)(D), *109 of the Revenue Act of 1942, to exclude from gross income for the taxable year 1934 recoveries in that year of bad debts previously charged off and deducted, but which deduction resulted in no tax benefit to petitioner. 7. Held, petitioner did not sustain a deductible loss by reason of the payment within its fiscal year ended April 30, 1935, of the balance of the principal of its previously issued first mortgage bonds, payment of which had been assumed in 1923 by a sublessee of petitioner. William Phillips, 46 B.T.A. 784, followed. John H. Watson, Jr., Esq., John T. Scott, Esq., and Robert W. Wheeler, Esq., 1669 Union Commerce Bldg., Cleveland, O., for the petitioner. W. W. Kerr, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These are consolidated proceedings for the redetermination of deficiencies as follows: Docket
Year ended
No.
Tax
April 30
Deficiency
108334
Income
1931
$ 9,778.41
108503
Income
1934
37,167.12
Income
1935
23,094.45
Income
1936
37,627.22
Income
1937
65,319.99
Excess profits
1937
3,657.75
Income
1938
23,659.60
Income
1939
28,857.53
Total
$229,162.07
*110 Seven issues are presented for decision which, for convenience will be stated seriatim preceding the findings of fact and opinion relating to each. At the hearing the parties filed in each proceeding a stipulation of facts, which is adopted in full as a part of our findings of fact, although not set forth in its entirety herein. The parties also filed supplemental stipulations which, so far as pertinent, will be given effect in the final settlements under Rule 50. Issue I. Did the Commissioner err in his determination of a reasonable allowance for exhaustion, wear and tear of property used by petitioner in its business? Findings of Fact Petitioner is an Ohio corporation, having its principal office and place of business at Cleveland. The income and excess profits tax returns of petitioner for the years herein involved were made on the basis of a fiscal year ended April 30, and all of such returns were duly filed with the collector of internal revenue for the eighteenth district of Ohio, at Cleveland. Prior to July 28, 1930, petitioner was engaged in the business of manufacturing forks, hoes and other miscellaneous articles, but did not manufacture axes or shovels. *111 Kelly Axe and Tool Company, hereinafter called Kelly, was, prior to the last mentioned date, a West Virginia corporation engaged in the business of manufacturing axes and other tools, but did not manufacture forks, hoes or shovels; and Skelton Shovel Company, hereinafter called Skelton, prior to such date, was a New York corporation engaged in the business of manufacturing shovels. The Canadian Shovel & Tool Company, Ltd., prior to July 28, 1930, was a Canadian corporation affiliated with Skelton, and was engaged in the manufacture of shovels in the Dominion of Canada. On July 28, 1930, pursuant to authorization contained in a resolution adopted by petitioner's directors and subsequently ratified by its stockholders, petitioner entered into a contract with Kelly and Skelton whereby it agreed to purchase, and the last named companies agreed to sell, all of the property, assets and business of each as a going concern, for a stipulated consideration, the assets of Skelton to include also all of the assets of the Canadian Shovel & Tool Company, Ltd. Pursuant to such agreement, petitioner, on July 31, 1930, acquired all the property and assets of Kelly, paying therefor on said date 12,000 *112 shares of its preferred stock of the par value of $100 per share, and 154,541 shares of its common capital stock without par value, and, in addition, assuming all of the debts and liabilities of Kelly. On July 31, 1930, the fair market value of petitioner's preferred stock was $100 per share, and the fair market value of its common shares was $25 1/3 per share, the aggregate fair market value on that date of 12,000 shares of petitioner's preferred stock and 154.541 shares of its common stock being $5,115,038.67. In addition to the stock paid as part of the purchase price of Kelly's assets, petitioner assumed liabilities of Kelly in the amount of $210,616.62, making the total cost to petitioner of the property and assets acquired from Kelly the sum of $5,325,655.29. The assets acquired by petitioner from Kelly included (1) current assets, (2) investments, (3) accounts due from officers and employees of Kelly, and (4) deferred charges to operations. These accounts were worth face value, and, together with the liability accounts, were set up on petitioner's books in the amounts shown on Kelly's books at the date of transfer. The asset accounts mentioned amounted to $2,444,435.22 and *113 comprised the following items: (1) current assets in the total amount of $1,970,992.27 (consisting of cash $461,982.44; notes and loans receivable $151,389.95; accounts receivable, less reserve, $261,529.34; merchandise, work in progress and materials, $1,068,133.52; accounts receivable, miscellancous, $27,957.02); (2) investments $383,794; (3) due from officers and employees $69,462.53; and (4) deferred charges to operations (consisting principally of prepaid insurance) $20,186.42. The balance of the purchase price paid by petitioner in the amount of $2,881,220.07 was the cost to petitioner of the land, buildings, machinery and equipment, acquired from Kelly. Of this sum, $249,016.52 represented the fair value of the land and the amount at which petitioner set up the cost of this item on its books (to which was added $1 for patents and trade-marks) and $16,084.66 represented the cost of patterns. The land and patterns having been treated by petitioner as non-depreciable assets, the remainder of the purchase price, or the sum of $2,616,117.89 represented the cost to petitioner of the depreciable assets acquired from Kelly. Kelly's plant at Charleston, West Virginia, occupied about *114 20 acres of land for manufacturing purposes, of which about 16 acres was manufacturing floor space. It was the largest plant of its kind in the United States at the time of its sale to petitioner. It had a daily production capacity of eight to ten thousand axes, twelve hundred scythes, twenty-four hundred hammers, about twenty-five hundred hatchets and three thousand to thirty-six hundred miscellaneous tools, working one shift of eight or nine hours. Negotiations looking to the sale of Kelly's property and assets to petitioner were opened early in 1929, and were continued until the sale was consummated on July 31, 1930. Negotiations were conducted on behalf of petitioner principally by G. B. Durell, its president, Winthrop Withington, its vice-president, manufacturing director and member of the executive committee, and C. G. McGhie, vice-president and general manager of the Welland Vale Manufacturing Company, Ltd., a subsidiary of petitioner. The negotiations were conducted on behalf of Kelly by W. C. Kelly, chairman of its board of directors, George T. Price, its president, and Duncan Bruce, its vicepresident. The officers of petitioner made a very careful investigation of the *115 value of the property and assets of Kelly, and in that connection employed a firm of New York public accountants to audit Kelly's books to ascertain if the quick or current assets, investments, accounts due from officers and employees, deferred charges and liabilities, as set up in those accounts, were correct. McGhie, who had had many years experience in the manufacture of axes, together with Durell, made several trips to Charleston, West Virginia, for the purpose of examining the Kelly plant, and Withington, who had had more than 20 years experience in the manufacture of similar tools, checked the data collected by McGhie, as well as other figures and appraisals submitted by the officers of Kelly. The detailed figures as to the fair value of the different items of property in the Kelly plant, which were so collected by petitioner's officers, aggregated $3,500,000 to $3,600,000, but petitioner's officers concluded that these figures should be discounted and that petitioner ought to pay therefor somewhat between $2,800,000 and $3,000,000. Accordingly, Kelly was advised that its asking price of $7,000,000 for all of its property and assets was too high, and the negotiations thereafter *116 continued until the parties finally agreed on the sale made on July 31, 1930. In the ax industry, it had been the custom for many years for manufacturers and jobbers to designate each kind or grade of ax by a trade name or a trade-mark. In the year preceding the sale of Kelly's assets to petitioner, manufacturers of axes in this country had approximately 150 trade names or brands for axes and 40 or 50 additional trade names for other similar tools, and jobbers were using several hundred additional brands for axes. Kelly had trade names and brands for its different kinds and grades of axes and other tools, but its customers had the option of buying its axes with or without the Kelly brands thereon at the same price, and the purchasers of approximately 50 percent of its axes purchased them without any Kelly brand thereon. The axes sold by Kelly under its trade-marks were sold at the same prices as those at which its competitors sold similar grades. After the purchase of the Kelly assets, petitioner continued to use some Kelly trade-marks, discontinued the use of others, and adopted some new trade names. Among the assets acquired by petitioner from Kelly was one patent for an improvement *117 on a riveted heel scythe. However, the invention proved to be without merit, and the patent, at July 31, 1930, had no value. Under date of December 12, 1923, Kelly charged to an account on its books entitled "Patents" the sum of $1,617,866.07, and credited the same amount to its "Plant" account. The original entry was made in 1901, and insofar as the entries of 1923 involved a credit to the plant account, they were erroneous. At no time during the negotiations above referred to did the officers of Kelly ask for any payment for or on account of patents, trade-marks or good will of Kelly. It was the opinion of the officers of both parties that Kelly had no such intangible assets of salable value. No part of the consideration paid by petitioner for Kelly's assets was paid for patents, trade-marks or good will. Opinion The first issue presented here, generally stated, involves the question of whether respondent has made a reasonable allowance for depreciation sustained on the assets acquired by petitioner from Kelly in 1930. The basis for computing the allowance for depreciation is the cost of the property, with exceptions not presently material. The exceptions mentioned include corporate *118 reorganizations, but since the parties have agreed that no such reorganization is involved in the present case, we accept their stipulation without discussion, and proceed to consideration of the issue on the premise that the basis of the property is cost. The cost of the property to petitioner was, of course, what petitioner paid for it. Thus, the question to be resolved is, what did petitioner pay for the depreciable assets? The consideration paid for all of Kelly's property, consisting of a mixed aggregate of tangibles and intangibles, depreciable, consisted of shares of petitioner's capital stock having a stipulated fair market value of $5,115,038.67, and the assumption by petitioner of liabilities of Kelly in the amount of $210,616.62, making a total cost of $5,325,655.29. The assets so acquired by petitioner included certain items designated quick or current assets, investments, accounts due from officers and employees, and deferred charges to operations, in the total amount of $2,444,435.32, which were ascertained to be worth face value and were set up on petitioner's books in the amount shown on Kelly's books on the date transferred to petitioner. It follows that the balance *119 of the total purchase price, or $2,881,220.07, was the cost to petitioner of the land, buildings, machinery and other tangibles, as well an intangibles, if any. Of this remaining sum, $249,016.52 represented the value of the non-depreciable land, and $16,084.66 represented cost of patterns, also a non-depreciable asset. Eliminating these two items leaves the sum of $2,616,117.89 as the cost of the depreciable assets, as contended by petitioner. There is no serious controversy between the parties down to this point, but here respondent contends in substance that the amount claimed by petitioner as cost of the depreciable assets in fact includes $1,100,000 paid for patents, trade-marks and good will acquired from Kelly. The issue, thus, is narrowed to the specific question of whether or not petitioner paid any part of the total consideration for good will, which is understood also to embrace patents and trade-marks. This question is purely one of fact, which must be determined from the evidence before use. Respondent's determination of what constitutes a reasonable allowance for depreciation is, in the first instance, presumptively, correct, and petitioner has the burden of proving *120 that it is erroneous, , but when competent and relevant evidence has been adduced by petitioner to support its position, and evidence has likewise been presented by respondent, the presumption of correctness no longer may be invoked to aid respondent; the issue must then be decided upon consideration of all evidence presented by both parties. ; . The facts disclosed by the evidence here may be summarized as follows: Petitioner acquired only one patent from Kelly and this patent had no value. Petitioner acquired a number of trade-marks or brands, some of which it continued to use, but some were discontinued and new brands adopted. The trade-marks acquired from Kelly appear to have been of doubtful value, since Kelly sold axes at the same price with or without its trade-mark thereon, and approximately 50 percent of the axes were sold without bearing its trade-marks. Also the trade-marked axes were sold at the same price obtained by other manufacturers for similar *121 grades. As to good will, apart from patent and trade-marks, petitioner concedes that Kelly had good will in the sense that the company had a good reputation and standing in the trade, manufactured products of quality and gave good service to its customers, but petitioner's officers did not consider that Kelly had any good will of salable value. Winthrop Withington, one of the officers of petitioner who represented it in the negotiations, when asked whether any consideration was given at any time to the matter of paying anything for the good will of Kelly, answered, "No, decidedly not." He further testified that the representatives of Kelly did not, to his knowledge, ask any payment for or in respect of the good will of Kelly. Duncan Bruce, one of Kelly's officers who represented that company in the negotiations, testified that no payment was requested by Kelly for good will, trade-marks or trade brands. George T. Price, president of Kelly and who also participated in the negotiations, stated that no payment was asked for Kelly's good will, and that in his opinion Kelly had no good will that was salable. It is further shown by petitioner's evidence that its officers, after having *122 made a most careful and detailed investigation, concluded that the plant assets of Kelly had in fact a fair value of $3,500,000 to $3,600,000, not including any value for good will, which value was considerably in excess of the amount finally paid by petitioner for the different items of assets in the Kelly plant. Opposed to this direct affirmative testimony that petitioner did not pay anything for Kelly's good will, respondent offered a mathematical computation based upon an alleged valuation formula, made by one Adolph H. Wellensiek, a valuation engineer employed in the Cleveland office of the Bureau of Internal Revenue, who testified as a witness in that connection. This computation was made according to a formula briefly described as follows: Witness took all basic figures from the income tax returns of Kelly for a period embracing substantially the five fiscal years preceding July 31, 1930. The first factor employed was book value of the total assets at the beginning of each year, from which he deducted the amount of debts shown at the beginning of each year, plus the sum of $1,617,866.07 representing the "patents" account on Kelly's books. The remaining amount was designated *123 tangibles, including stocks and bonds. Of the net income per returns, an amount was attributed to the securities equal to 7 percent of the book value, and 9 percent was allowed on the balance of the tangibles. The remaining net income per returns was allocated to intangibles and capitalized at 15 percent to arrive at a fair market value for good will of $1,100,000. From the foregoing computation, respondent argues that it is obvious that Kelly had good will of the value of $1,100,000, and hence it must be assumed that of the total consideration paid by petitioner for Kelly's assets it paid an amount equal to such value for good will, or the intangible value reflected in trade-marks, trade brands and good reputation. Respondent's computation, in our opinion, is subject to such infirmities as to deprive it of any substantial probative value. All basic factors are assumed without any proof of their correctness, other than they were taken from Kelly's income tax returns and balance sheets and other statements attached thereto. Notwithstanding it is asserted that the computation establishes fair market value of good will, it is not shown that the gross book value of assets reflected *124 fair market value, or in fact any other sort of value. On the contrary, respondent's own witness, Wellensiek, testified that the gross value of tangible assets had been excessively depreciated on Kelly's books, resulting in his allowance of an increased net value for depreciation purposes of more than $300,000. In these circumstances, it would be difficult to justify an assumption that Kelly's books were properly kept or correctly reflected true value of assets. As before stated, the first factor to which respondent applies his formula is book value of assets. It is a sound presumption to say that petitioner paid for good will an amount equal to the value included therefor in the total assets as demonstrated by the formula, then our question becomes, what was the fair market value of the gross assets? If we accept respondent's assumption, without proof, that book value reflected fair market value, we then decide the question upon an inference based upon an inference. Another serious objection to respondent's computation lies in the fact that the gross book value of the assets was reduced by the amount of $1,617,866.07 representing Kelly's patent account, which the evidence indicates *125 had been erroneously taken out of the plant account for reasons not disclosed by the record, and the further fact that the net income per returns was not reduced by the amount of Federal income and excess profits taxes paid by the Kelly corporation. Obviously, it is the corporate net earnings, not the taxable net income, which gives rise to value allocable to intangibles. Putting aside all other objections, correction of these errors in respondent's computation would tend to indicate that no part of Kelly's earnings during the period in question could be ascribed to good will or similar intangibles. In , both the issue and the facts are substantially similar in many respects to those of the instant proceedings. The method approved by the Court for valuing intangibles (patents), for purposes of depreciation, is indicated in the following extract from its opinion: The amount of $19,556,992.43 was paid for all the assets, the tangible assets were worth $7,091,332.04, leaving $12,462,060.39 as the price paid for the intangible assets. The only intangible assets *126 regarded by the parties as of any value were the patents, so, it must follow that this sum was paid for the patents. It may be that the seller's good will really did have a value, but if the parties did not think so and, in computing the price to be paid, gave it no value, it must be eliminated from consideration in computing the amount paid for the other assets. Upon consideration of all the evidence, we think petitioner in the case at bar has sustained its burden of proof, and we have accordingly found that the cost to petitioner of the depreciable assets acquired from Kelly at July 31, 1930, was $2,616,117.89. The action of respondent on the first issue is reversed. Issue II. Is petitioner, reporting on an accrual basis, entitled to deduct from gross income for the fiscal year 1931 amounts representing rebates on axes sold in that year, where all events fixing its liability occurred in such year, but the amounts were not ascertained nor the rebates paid until after the close of the year? Findings of Fact In 1930 and during the first three months of 1931, petitioner sold axes to its jobber customers with a guarantee against reduction in price. In substance, petitioner agreed *127 that if prices were reduced, it would credit or rebate to its jobbers, with respect to axes purchased in 1930-1931, which remained in the jobbers' inventories on the date the price reduction became effective, the difference between the prices paid to petitioner and such reduced price. Effective April 1, 1931, petitioner reduced its price on axes, and on or about that date sent requests to its various customers to report the number of axes in their inventories on such date purchased in 1930 and the first three months of 1931. Petitioner's fiscal year ended on April 30, 1931, and on that date petitioner did not know the aggregate amount of its liability to its customers on account of the price reduction. Accordingly, petitioner estimated that the rebates would amount to $42,000, and on the last day of its fiscal year set up on its books a "reserve for special credits" in such amount. During May, June and July, 1931, the reports of the jobbers as to the axes in their inventories at April 1 were received and checked by petitioner, and rebates in the aggregate sum of $36,540.14 were made to more than 450 jobbers. In its income tax return for the fiscal year ended April 30, 1931, petitioner *128 failed, through oversight, to include the amount of the rebates above mentioned in cost of sales or otherwise to reduce its income on that account, nor was the reserve for special credits in the amount of $42,000 deducted in arriving at net income, although the latter amount was listed as a debit to surplus in Schedule L, "Reconciliation of Surplus," attached to the return. On January 13, 1934, petitioner filed a claim for refund for its taxable year 1931, based upon the contention, among others, that a deduction should be allowed on account of "reduction of $36,580.72 in closing inventory, year ended April 30, 1931," which was disallowed by respondent "for the reason that it has not been established that the closing inventory stated in the return for said year was understated. Opinion There is no controversy between the parties respecting the material facts pertaining to this issue. Petitioners sold axes in 1930 and during the first three months of 1931 with a guarantee against reduction in prices. On April 1, 1931, petitioner reduced its prices and thereupon became obligated to credit or refund to its customers, on the basis of the axes then in their inventories purchased in *129 1930-1931, the difference between the prices paid and the reduced prices. Petitioner's fiscal year ended on April 30, and during the intervening period subsequent to the price reduction and prior to the end of the fiscal year, petitioner was unable to ascertain the exact amount of its liability under its guarantee. It therefore set up on its books a reserve of $42,000 to cover the estimated amount of such liability, but neither the amount of reserve nor any other sum was deducted from or offset against gross income in its income tax return. Reports were received from all jobbers and verified by petitioner prior to the end of July 1931, and rebates were made by petitioners in the aggregate amount of $36,540.14, which amount, petitioner contends, should be allowed as a deduction in computing net income for its fiscal year ended April 30, 1931. In computing the deficiency respondent disallowed the deduction. Respondent now objects to allowance of the deduction on two grounds. First, he argues that petitioner's liability was not incurred until the amount of such liability had been determined in July 1931, subsequent to the close of the taxable year ended April 30, and so is not allowable *130 as a deduction from gross income for that year. We can not agree with this conclusion. The ascertainment of the precise amount of the liability does not control the question of when the liability became fixed and unconditional. We think it is clear that petitioner's liability to make rebates became absolute on April 1, 1931, when it reduced its prices on the axes. Also on that date all events had occurred (within the taxable year) to fix the exact amount of such liability, although the amount was not then immediately ascertainable. In such circumstances, the deduction is allowable in the year claimed. ; ; ; ; . The second ground of respondent's objection is that petitioner set up its estimated liability on its books at the close of its fiscal year in the form of a reserve for special *131 credits in the amount of $42,000, and reserves are not deductible. As we pointed out in :
True reserves representing mere appropriations of surplus are not proper deductions from income, unless specifically provided for by statute; but when an item is without question within the realm of ordinary and necessary business expenses, it may be deducted, in the case of a taxpayer on an accrual basis, in the year in which incurred, regardless of the style or accounting nomenclature by which it may be called. See also We think petitioner is entitled to deduct the liability for rebates actually paid in the amount of $36,540.14, as claimed. Respondent's action on the second issue is reversed. Issue III. Did petitioner sustain a deductible loss by reason of certain corporate stock becoming worthless in the taxable year ended April 30, 1931? Findings of Fact In 1920, petitioner purchased 1,050 shares of the preferred stock of W. J. Kingsland & Co., a New York corporation, hereinafter called Kingsland, at a cost of $105,000, and continued *132 to own and hold such shares until September 2, 1930. Kingsland was organized late in 1919, with an authorized capital stock consisting of 3,000 shares of preferred stock of the par value of $100 per share, and 3,000 shares of common stock without nominal or par value. Each class of stock had the same voting powers. Kingsland was engaged in the business of exporting and importing, and had a large organization with representatives in various parts of the world. During the period from 1920 to about October 1930, Kingsland acted as export agent for petitioner and other preferred stockholders, as well as for companies who owned none of its stock. In 1920 Kingsland earned net profits, but in each of the years 1921 to 1927, inclusive, it sustained an operating loss. In its income tax return for 1928, the company reported net income of $1,983.82, and in its return for 1929 it showed a net loss of $13,719.37. Kingsland's balance sheet at December 31, 1929, disclosed total assets of $223,378.54, total liabilities (other than capital stock) of $120,678.24, and a net worth of $102,700.30. A balance sheet taken from the books of Kingsland at the close of business on April 30, 1930, disclosed *133 total assets of $228,296.16, including cash and accounts receivable in the amount of $207,389.01, total liabilities (other than capital stock) of $137,030.07, and a net worth of $91,266.09. In July 1930 it became apparent that Kingsland needed additional working capital. Petitioner was willing to put more money into the company, and to that end conferred with several other preferred stockholders. However, there were some who were not willing to contribute any additional capital, and did not care to continue their connection with the company. It was then decided to liquidate Kingsland and organize a new export company. Thereafter, petitioner and five other manufacturing concerns, who were preferred stockholders of Kingsland, caused a new corporation to be organized under the laws of the State of New York on July 31, 1930, for the purpose of engaging in the exporting and importing business, having an authorized capital of 5,000 shares of common stock of the par value of $20 per share. Preferred stockholders of Kingsland subscribed and paid cash for 2,450 shares of the new corporation's stock at par. Petitioner subscribed for 1,050 of such shares. Most of the preferred stockholders *134 of Kingsland sold their stock for $1 to G. B. Durell, who was then president of petitioner. Petitioner sold its preferred stock in that company to Durell for $1 on September 2, 1930. On October 8, 1930, all of the assets of Kingsland were transferred to, and its liabilities were assumed by, the new corporation, and on October 9, 1930, Kingsland was dissolved. Kingsland's assets were in large part located with representatives in foreign countries, and if the business of the company had not been carried on, those assets would have greatly depreciated in value. Kingsland continued to carry on its business in the normal manner until October 8, 1930. During the period from May 1, 1930 through September of that year, petitioner and one of the subsidiaries continued to make shipments of merchandise to Kingsland on open account. The stock of Kingsland was worthless at all times subsequent to October 9, 1930, and become worthless within the taxable year ended April 30, 1931. Opinion The sole question presented is whether or not the preferred stock of Kingsland became worthless within the taxable year 1931. That petitioner actually sustained a loss in the amount claimed is not in controversy. *135 Petitioner has the burden of proving that the stock became worthless in the year for which the deduction is claimed, since respondent has determined that it became worthless in a prior year, and as a part of such burden petitioner must of necessity show that the stock had some intrinsic or potential value at the close of the preceding year. . To meet its burden of proof, petitioner offered in evidence a balance sheet taken from Kingsland's books at the close of business on April 30, 1930, which disclosed a book value of assets in the amount of $228,296.16 and liabilities, other than capital stock, of $137,030.07, thus indicating a net worth per books of $91,266.09 at the beginning of the petitioner's taxable year. It is not shown that the book value of the assets bore no reasonable relation to the actual or fair market value, as in . On the contrary, since such book value included cash and accounts receivable in the sum of $207,389.01, we can not assume, in the absence of other proof, that the book value did not in fact represent *136 actual value to a substantial extent. "The assets of a corporation may be considered in arriving at the value of its stock, , and in the absence of any different showing, the book value of those assets is some evidence of their actual value sufficient to shift the burden of going forward to the respondent." . See also . Respondent argues that Kingsland was an organization whose functions were principally for the convenience of petitioner and other stockholders, and that its income tax returns, offered in evidence by respondent, show that it "sustained enormous losses in each and every year of its operations from 1921 to 1930, inclusive." We can not agree with respondent's conclusion, however, that such losses indicate that Kingsland's stock necessarily became entirely worthless prior to the taxable year. While such losses undoubtedly seriously impaired the value of the stock, the uncontradicted evidence shows that at the beginning of the year the stock then outstanding had a book value in *137 excess of $91,000. The evidence adduced by petitioner was clearly sufficient to shift the burden of going forward to respondent. Respondent failed to assume such burden. On the state of the facts presented, we must sustain petitioner on this point. Respondent's action is reversed. Issue IV. Is petitioner entitled to credits against its United States income taxes for the fiscal years ended April 30, 1931, 1936 and 1939 on account of foreign income taxes paid by its Canadian subsidiary? Findings of Fact During the fiscal year ended April 30, 1931, petitioner owned all the capital stock of Welland Vale Mfg. Co. Ltd. (the name of which, until on or shortly prior to July 31, 1930, was General Land & Industrial Company, Ltd.), a Canadian corporation, hereinafter called Welland. On April 30, 1931, petitioner received from Welland a dividend of $255,405, all of which petitioner included as income in the income tax return of petitioner and its subsidiaries for the fiscal year ended April 30, 1931. Such dividend was the only income received during that fiscal year by the petitioner from sources within the Dominion of Canada or from sources *138 without the United States. During the fiscal period from August 1, 1930 to April 30, 1931, both dates inclusive, Welland earned taxable net income in the sum of $98,134.70 upon which income, war-profits or excess-profits taxes were assessed by foreign countries, and were paid by Welland in the sum of $11,819.39, leaving a net profit of $86,315.31, which, together with income from prior years and from subsidiaries in the sum of $169,089.69 was included in the dividend of $255,405 so received by petitioner. Prior to July 31, 1930, General Land & Industrial Company was a holding company and owned all of the capital stock of Bedford Manufacturing Co. Ltd., Canada Ax & Harvest Tool Mfg. Co. Ltd., Maple Leaf Harvest Tool Co. Ltd., and Welland Vale Mfg. Co. Ltd. Prior to such date, the four last named corporations were actively engaged in manufacturing operations, and those operations were carried on by Welland thereafter. The following schedule sets forth, for each of the respective companies, for the fiscal year ended July 31, 1930, the profits before income taxes, the foreign income tax paid, profits after foreign income tax paid, and earned surplus at July 31, 1930: Profits after
Profits Before
Foreign Income
Foreign Income
Earned Surplus
Name of Company
Income Tax
Tax Paid
Tax Paid
July 31, 1930
Welland Vale Manufacturing Com-
pany, Ltd. (formerly General
Land and Industrial Company,
Ltd.)
$ 87,061.62
Bedford Manufacturing Company
$ 8,801.82
$ 727.17
$ 8,077.65
48,962.26
Canada Axe and Harvest Tool
Manufacturing Company, Ltd.
19,379.90
1,439.20
17,940.70
247,063.18
Maple Leaf Harvest Tool Com-
pany, Ltd.
34,412.09
3,241.36
31,170.73
364,320.95
Welland Vale Manufacturing Com-
pany, Ltd.
70,304.46
6,599.95
63,704.51
601,332.06
Totals
$132,898.27
$12,004.68
$120,893.59
$1,348,740.07
*139 Under date of July 16, 1930, Welland entered into a memorandum of agreement with each of its wholly owned subsidiaries, above referred to, whereby each subsidiary agreed to sell and Welland agreed to purchase "the entire undertaking and assets of the Vendor of every kind and wheresoever situate as a going concern."Each agreement contained the following additional provisions: 2. In consideration of the said sale and purchase the Purchaser covenants and agrees with the Vendor that from and after the date hereinafter mentioned it will assume all the debts, liabilities, contracts, claims and demands of every sort owing by the Vendor in connection with the said business. * * * * *
4. The sale and purchase hereby provided for shall be made and take effect as of the close of business on the 31st day of July 1930. The income taxes of the four subsidiary Canadian corporations of Welland were billed in their respective names after July 31, 1930, but the taxes were actually paid by Welland. For purposes of the Canadian income tax, all of Welland's subsidiaries reported on the basis of a fiscal year ended July 31. The Canadian income taxes listed in the above schedule were computed at the *140 rate of 10 percent, the rate having been increased from 8 percent by an amendment of the Canadian tax law effective August 3, 1931, retroactively applicable to the calendar year 1930 and all fiscal periods ending therein. Opinion Two questions were raised by the pleadings in respect of the credits for foreign taxes claimed by petitioner. The first question was involved in determining petitioner's income tax liability for the taxable years 1931, 1936 and 1939, and related to the method or formula, under section 131 (f) of the Revenue Acts of 1928, 1934 and 1938 for determining the amount of petitioner's credit for foreign taxes in respect of the Canadian income taxes paid by petitioner's wholly owned subsidiary, Welland Vale Mfg. Co., Ltd. Petitioner claimed that it was entitled to a credit in a sum equal to the proportion of the entire Canadian tax paid by Welland which the dividend paid by such subsidiary to petitioner bore to the accumulated profits. Respondent contended in substance that the credit was limited to that portion of the Canadian tax which bore the same ratio to the total tax that the accumulated profits bore to the total profits. Petitioner now concedes that this *141 question, since the hearing of these proceedings, has been decided adversely to its contention, by the Supreme Court in . The question, thus, is eliminated in respect of all three taxable years involved, and in so far as the general issue in respect of the credits of foreign taxes relates to the taxable years 1936 and 1939, we approve respondent's determination. The second question raised by the petitioner under this issue pertains only to the taxable year ended April 30, 1931. Petitioner originally claimed a foreign tax credit for that year in the sum of $12,004.68, but now concedes that under the decision in the American Chicle case, supra, the amount of the credit should be limited to $10,920.30. This second question is whether or not, in computing petitioner's credit for foreign taxes, there should be included as taxes deemed to have been paid by it the amount of the Canadian income taxes paid by Welland on income earned by Welland's four subsidiaries prior to July 31, 1930, and which Welland subsequently paid pursuant to the obligation assumed under the agreements of July 16, 1930; in *142 other words, the question briefly stated is whether or not petitioner is entitled to take a credit for foreign taxes paid by its subsidiary on the income earned by the subsidiaries of petitioner's subsidiary. So far as material here, the provisions of section 131 (f), [1] Revenue Act of 1928, under which petitioner claims the credit in controversy, are set out in the margin. All subsequent revenue acts contain substantially the same provisions. The statute allows the credit for foreign income taxes "deemed to have been paid" by a domestic corporation (1) where the domestic corporation owns a majority of the voting stock of a foreign corporation, (2) from which the domestic corporation receives dividends in any taxable year, and (3) where the foreign tax was paid by such foreign corporation upon its accumulated profits. *143 In the instant case, petitioner did not own any of the voting stock of the four Canadian subsidiaries of Welland, nor did petitioner receive any dividends from those corporations in the taxable year, and lastly the taxes, which form the basis of the credit claimed by petitioner, were not paid by petitioner's subsidiary upon its own accumulated profits. When Welland paid the Canadian taxes imposed upon the income earned by its subsidiaries, it did not pay a tax within the meaning of our taxing statutes; it merely thereby discharged a contractual liability assumed under the agreements of July 16, 1930, and the amounts paid constituted part of the cost of the assets acquired. "Our system of credits and deductions is built around a concept of direct liability for taxation and direct payment. It is not administered upon the theory of ultimate burden or the final incidence of taxation." , affirmed . Cf. . The question of whether a domestic corporation is entitled to the foreign tax credit on account of income taxes *144 paid to a foreign government by a subsidiary of the domestic corporation's subsidiary has been directly decided contrary to petitioner's contentions. , ; . Petitioner urges the final argument that, since one-fifth of the Canadian income taxes in question was retroactively imposed by a statute enacted in 1931, such increased tax was never a liability of Welland's subsidiaries but was its primary liability, and that therefore petitioner in any event is entitled to credit in that amount. Petitioner's argument is not persuasive. In our opinion the increased tax gives rise to no legal consequence materially different from the original tax. It was not a direct tax liability of Welland but was paid by Welland pursuant to its contractual obligation. It was a tax levied upon the earnings of Welland's subsidiaries, and, although the amount of such additional tax may not have been known until enactment of the amendment, *145 Welland must be presumed to have known at the time it assumed the liabilities of its subsidiaries, which included all tax liability, that the amount of such liability might be increased by the Canadian government in the very manner in which such increase was effected. Respondent's determination in respect of the foreign tax credit claimed by petitioner for the taxable year ended April 30, 1931, is approved. Issue V. Is petitioner entitled to deduct from gross income for its taxable year 1934 amounts paid in that year as interest on a tax liability assumed by it in connection with the acquisition of the assets of another corporation? Findings of Fact Petitioner, as part of the purchase price of the assets acquired by it on July 31, 1930 from Kelly Axe & Tool Company, assumed all of the debts and liabilities of Kelly. In 1919 Kelly had acquired the assets of the American Ax & Tool Company. Thereafter, the Commissioner of Internal Revenue determined a deficiency in income tax against the American Ax & Tool Company for the year 1918 in the sum of $81,721.06, with interest, and asserted liability therefor against Kelly as transferee; the Commissioner further asserted liability *146 against petitioner for such tax and interest because of petitioner's contract of assumption of Kelly's liabilities. Petitioner contested its alleged liability and filed a petition with the Board of Tax Appeals. In April 1933 petitioner made an offer to settle the tax claim then pending before the Board of Tax Appeals, and accompanied the offer with a check for $5,000, which offer was rejected. In September 1933 a settlement was effected, pursuant to which petitioner agreed to and did pay the tax of $81,721.06 in installments, and interest thereon in the sum of $40,483.75. The tax and interest were paid by applying thereon the $5,000 tendered in connection with the offer of settlement in April 1933, and by additional payments in September 1933, and in January and February 1934, all within petitioner's fiscal year ended April 30, 1934. Of the $40,483.75 interest paid as aforesaid $21,723.25 was for interest prior to July 31, 1930, the date on which petitioner assumed the debts and liabilities of Kelly, and $18,760.50 was for interest after said date. At the time of the acquisition by petitioner of the assets of Kelly, the latter's balance sheet listed among its liabilities a reserve *147 for Federal income tax liability in the amount of $100,000. In setting up on its books the cost of Kelly's assets petitioner included a reserve for contingencies in the same amount of $100,000, intended to cover the tax liabilities of Kelly assumed by petitioner. Petitioner paid income tax liabilities of Kelly and predecessor companies in the total amount of $103,355.27, exclusive of interest, and in that connection received a refund of $18,438.82, leaving a net amount of $84,916.45 charged against the reserve for contingencies, above mentioned, and an unused balance remaining in such reserve of $15,083.55. Opinion Petitioner claimed a deduction in its income tax return for 1934 in the amount of $40,483.75 representing interest paid in that year in connection with the settlement of petitioner's liability for taxes due from Kelly Axe & Tool Company, under petitioner's contract of assumption. The deduction in its entirety was disallowed by respondent. Petitioner acquired the assets of Kelly on July 31, 1930, paying therefor shares of its capital stock and in addition assuming Kelly's liabilities, including taxes. The interest deduction of $40,483.75 claimed by petitioner represented *148 interest on Kelly's tax liability for the period ended July 31, 1930, in the amount of $21,723.25 and for the period subsequent to that date in the amount of $18,760.50. Petitioner now concedes that $15,083.55 of the interest for the period prior to July 31, 1930, should be charged against the unused balance of its reserve for contingencies and treated as part of the cost of the assets acquired from Kelly. Petitioner insists, however, that it is entitled to deduct the balance of the interest for the period before July 31, 1930, in the amount of $6,639.70, plus $18,760.50 representing the entire amount of interest paid for the period subsequent to that date, or a total interest deduction of $25,400.20. The legal principles applicable in determining the allowance of interest deductions have been the subject of consideration in many decided cases. In , it was pointed out that "the statutory deduction for interest is confined to amounts chargeable qua interest against the taxpayer, and excludes amounts contractually paid to or for another to discharge the other's interest obligation." See also ; *149 ; , affirmed ; . Thus, interest, paid by a taxpayer on a debt or obligation for which he is primarily and personally liable is deductible as such by him. , and where the taxpayer acquires property subject to a mortgage which becomes his indebtedness, he is entitled to deduct the interest accruing thereafter, . The same principle applies in the case of the assumption of a tax liability. Interest for the period prior to the date on which the liability becomes an obligation of the taxpayer by assumption or otherwise is not deductible; interest for the period subsequent thereto is deductible. . Interest on the tax liability here in controversy for the period prior to July 31, 1930, was interest on Kelly's obligation, and when paid by petitioner did not constitute an *150 allowable deduction to it. Such amount represented part of the cost to petitioner of the assets acquired from Kelly. But a different situation is presented in respect of the interest for the period subsequent to July 31, 1930. Upon assumption of Kelly's tax liability on that date, it became petitioner's primary obligation, and the interest accruing thereafter was petitioner's own interest and is deductible by it. It follows that respondent erred in disallowing the interest deduction claimed by petitioner to the extent of $18,760.50. Issue VI. Is petitioner entitled to exclude from gross income for the taxable year 1934 the sum of $3,952.76 representing the amount recovered by petitioner in that year on debts charged off and deducted as worthless in a prior year in which petitioner had no net income? Findings of Fact During the fiscal year ended April 30, 1933, petitioner charged off on its books of account, as bad debts, the amount of $3,952.76 and deducted such amount in its tax return. Petitioner had a net loss in that year in excess of the bad debt deduction. In its fiscal year ended April 30, 1934, petitioner recovered the sum of $3,952.76 previously so charged off, and *151 respondent included the amount in petitioner's gross income for the year of recovery. Opinion Respondent now concedes error in respect to this issue for the reason that, since the hearing of these proceedings, the Revenue Act of 1942 has been enacted, and provides in section 116 (a) (12) (D), retroactively applicable to the taxable year, that recoveries of bad debts charged off in a prior year are not includable in taxable income in the year of recovery where the taxpayer realized no tax benefit as a result of the charge off and deduction. Accordingly, respondent's action is reversed. Issue VII. Did petitioner sustain a deductible loss in the fiscal year ended April 30, 1935, by reason of the payment by it in that year of its previously issued first mortgage bonds, the payment of which had been assumed in 1923 by a sublessee of petitioner? Findings of Fact On or about April 27, 1920, petitioner subleased from the Union Building & Improvement Company certain real estate located in Cleveland, Ohio, on which was situated a building known as the Union Building. At the same time petitioner purchased from the Union Building & Improvement Company all of its right, title and interest *152 in the Union Building for the sum of $210,000 in cash and the assumption by petitioner of certain bonds then issued and outstanding in the aggregate face amount of $275,000, secured by a mortgage on the leasehold and building. The term of the sublease was for approximately 92 years from April 1, 1920, and required the payment by petitioner of substantial annual rentals thereunder. In addition, petitioner assumed the payment of taxes, assessments and public charges in respect of the property. On or about April 1, 1920, petitioner subleased from Solomon Ulmer, et al., certain real estate situated in the City of Cleveland, known as the Union-Prospect Garage property for a term of approximately 98 years. Under this sublease, petitioner was required to pay substantial annual rentals, and in addition, assumed the payment of taxes, assessments and public charges on the property. By mortgage or deed of trust dated December 1, 1922, petitioner mortgaged its subleases on the Union Building and Garage properties, and buildings thereon, to the Union Trust Company of Cleveland, as trustee, to secure an issue of 6% first mortgage leasehold gold bonds in the principal amount of $400,000, issued *153 by petitioner and maturing serially $15,000 per year from 1923 to 1936, both inclusive, and the balance on December 1, 1937, which bonds were sold by petitioner for the sum of $388,000. From the proceeds of such sale, petitioner paid the bonds of the Union Building & Improvement Company in the sum of $275,000, which had been assumed by petitioner. Under date of August 13, 1923, petitioner made a sublease to the Private Investment Company, an Ohio corporation, hereinafter called Investment Company, of both the Union Building and the Union-Prospect Garage properties, whereunder the Investment Company paid to petitioner $200,000 for the Union Building, and agreed to pay to a trustee named by petitioner, at least 15 days before they became due, all charges for interest on petitioner's bond issue, ground rent on the underlying leases, the principal of petitioner's bonds as the installments should fall due, and other minor expenses for which petitioner was liable. The Investment Company also assumed payments of taxes and assessments on the property. The lease instruments evidencing the sublease just mentioned, wherein petitioner was referred to as the lessor, and the Investment Company *154 as lessee, was effective as of July 1, 1923, but was actually executed on August 13, 1923, and provided that in case of default on the part of the Lessee in the payment of rent, taxes, assessments or other charges and payments by it to be made, or any part thereof, and such default shall continue for a period of thirty (30) days, * * * the Lessor at any time thereafter shall, without demand or notice (which are hereby waived), have full right, at its election, upon twenty (20) days' written notice to said Lessee, to enter upon the demised premises and take immediate possession thereof, and bring suit for and collect all rents, taxes, assessments, payments or other charges which shall have accrued up to the time of such entry, and thereupon from the time of such entry, this lease and all rights herein granted shall become void to all intents and purposes whatsoever, and all buildings and improvements on said premises shall be forfeited to the said Lessor, without compensation therefor to the Lessee; * * * The lease contract further provided that if an absolute sale and transfer of the lease should be made in compliance with the terms therein contained, the lessee should be free from *155 all further liability thereunder. In its income tax return for the fiscal year ended June 30, 1924, petitioner reported a profit on the transaction between it and the Investment Company in the sum of $46,079.41, and paid an income tax thereon. On or prior to December 1, 1928, the Investment Company did not pay the sum of $15,000 of principal and $9,750 of interest due on the first mortgage bonds of petitioner, which the Investment Company had agreed to pay on or prior to such date, and at all times subsequent thereto the Investment Company was in default in the payment of obligations assumed by it, consisting of principal and interest due on petitioner's bonds, and rentals and taxes. By reason of such defaults, petitioner served notices of forfeiture on the Investment Company on June 8, 1929 and July 27, 1931, and under and by virtue of the latter notice, the lease and all rights granted to the Investment Company therein became void, and all buildings and improvements on the leased premises were forfeited to petitioner, subject to the mortgage thereon, without compensation therefor to the Investment Company. Petitioner obtained possession of the property on or about August 27, *156 1931, and the Investment Company did not thereafter regain possession thereof. On December 1, 1934, petitioner paid in full the principal sum then remaining unpaid on its issued and outstanding 6% first mortgage leasehold gold bonds, amounting in the aggregate to $235,000, payment of which had been assumed by the Investment Company. On December 31, 1935, petitioner assigned and transferred to the Upper Euclid Company the sublease dated April 27, 1920 from the Union Building & Improvement Company, as lessor, and all of petitioner's estate, title and interest in and to the sublease, and the buildings and improvements located on the premises covered by the sublease. Petitioner received no consideration for such assignment except the assumption by the Upper Euclid Company of the lessee's engagements under the sublease, and except that the Upper Euclid Company agreed to repay to petitioner, on or before August 1, 1936, the sum of $4,400 which petitioner had been obliged by the terms of the sublease to pay, prior to the execution of the assignment and as a condition to the making thereof, as an installment of real estate taxes on the property, which would become payable in June or July, *157 1936. Subsequent to the time that notice of foreiture was served on the Investment Company and its lease forfeited, petitioner brought a suit against the Investment Company and the mortgagee to quiet title to the property in petitioner, and a decree was thereafter, on March 29, 1932, entered by the Court of Common Pleas of Cuyahoga County, Ohio, quieting petitioner's title. Following the forfeiture, and repossession of the property by petitioner on August 27, 1931, the Investment Company went out of business and has never operated since that time. At the time of the forfeiture and reacquisition by petitioner of the property in question, petitioner made no demand upon the Investment Company for any sums alleged to be due to petitioner from the Investment Company, and since August 1931 petitioner never at any time made any demand upon the Investment Company for payment of any obligation due it from the Investment Company. By contract dated August 29, 1931, petitioner agreed to purchase from the Investment Company certain furniture and fixtures for a consideration of $4,033.56, to be paid by petitioner on November 30, 1931, or when title should be adjudged in petitioner thereafter; *158 and by the same contract the Investment Company agreed to assign and transfer to petitioner certain policies of insurance on the buildings located on the premises covered by the sublease hereinabove referred to, and petitioner agreed to pay to Investment Company the pro rata unearned premiums on such policies in the amount of $2,232.82. The agreed consideration was subsequently paid to the Investment Company by petitioner. From and after August 27, 1931, the Investment Company was hopelessly insolvent. Opinion This issue involves the question of whether petitioner is entitled to a deduction from gross income for the fiscal year ended April 30, 1935, in the amount of $235,000, by reason of the payment by petitioner on December 1, 1934 of the balance of the principal of the outstanding first mortgage bonds issued by petitioner in 1922, but the payment of which had been subsequently assumed by the Private Investment Company. Petitioner contends, briefly, that it is entitled to deduct the full amount of such payment as an ordinary loss for the reasons (1) that the assumption of the liability by the Investment Company was treated by petitioner as a cash receipt in computing its income *159 tax for the year in which the obligation was assumed by the Investment Company; and (2) because the Investment Company was insolvent on December 1, 1934, and its obligation to pay the bonds or to reimburse petitioner for the payment thereof was uncollectible on that date and at all times thereafter. Petitioner urges the further contention that the question presented here is res judicata by reason of our decision in . Respondent takes the position that petitioner's loss was a capital loss, limited to $2,000 under the provisions of section 117 (d) of the Revenue Act of 1934, and that the loss was sustained at the time of the assignment and transfer of the sublease to the Upper Euclid Company on December 31, 1935, within petitioner's fiscal year ended April 30, 1936; hence, that no part of the loss is allowable as a deduction from gross income for the taxable year 1935. We must deny petitioner's contention that the issue as raised in these proceedings is res judicata by reason of our decision at . It is now the settled rule that where the subsequent action is upon *160 a different claim or demand, as in the instant case, the point or question to be determined in the later action is not res judicata by reason of the prior decision, unless it is the same as that litigated in the original action. . The question decided in the cited case was whether or not amounts paid by petitioner on the obligations assumed by the Investment Company in excess of reimbursement by the Investment Company, constituted accrued income of petitioner subject to tax. Since the amount appeared to be uncollectible because of the financial condition of the Investment Company, we held it was not chargeable against petitioner as taxable income. No question was there raised respecting the liability of the Investment Company to reimburse petitioner for amounts paid long prior to the forfeiture and repossession of the property by petitioner in 1931; the sole issue was whether the amount accrued on petitioner's books was subject to tax. An entirely different question is presented here. As we view the situation, the record in the case at bar discloses two separate, closed and completed transactions in *161 respect of the property involved. We are concerned with the first transaction only to the extent that it forms a part of the picture and background leading up to the second transaction, which gave rise to the loss deduction in controversy. In April 1920 petitioner subleased for a period of approximately 93 years the real estate on which the Union Building was located in the City of Cleveland, Ohio, and purchased the building. The consideration for the sublease was the assumption by petitioner of the payment of rentals, taxes, assessments and public charges. For the building, petitioner paid $210,000 cash and assumed payment of $275,000 principal amount of bonds secured by a mortgage on the leasehold and building. About the same time, petitioner subleased from another party the property known as the Union-Prospect Garage for a period of about 98 years, assuming the payment of rentals and taxes. In 1922 petitioner mortgaged these subleases and the buildings to the Union Trust Company, as trustee, to secure $400,000 principal amount of the 6% first mortgage leasehold gold bonds, maturing serially $15,000 per year thereafter to 1937. Petitioner sold these bonds for $388,000, and out *162 of the proceeds of sale paid off the $275,000 of bonds assumed by it. On August 13, 1923, petitioner subleased both the Union Building and the Union-Prospect Garage properties to the Investment Company. The sublessee paid petitioner $200,000 for the Union Building and agreed to pay the interest on petitioner's bonds and the installments of principal as they became due; also ground rent on the underlying lease, taxes and other minor expenses for which petitioner was liable. At this point, the first transaction above mentioned became closed and completed, and petitioner reported a profit thereon of $46,079.41 in its income tax return for the fiscal year ended June 30, 1924. In 1928 the Investment Company defaulted in payment of the interest on petitioner's bonds and on the installment of principal then due. It was thereafter in default in respect of all payments due. Pursuant to a notice of forfeiture which petitioner served on the Investment Company July 27, 1931, all rights of the Investment Company in the subleases and buildings were forfeited to petitioner, and on August 27, 1931, petitioner repossessed the property. On December 1, 1934, petitioner paid the balance of the principal *163 of its first mortgage bonds in the sum of $235,000, and on December 31, 1935, assigned and transferred to the Upper Euclid Company all of its estate, title and interest in and to the Union Building and leasehold. Petitioner received no consideration for such assignment and transfer except the assumption by the sublessee of petitioner's engagements under the sublease, and a refund of certain taxes theretofore paid by petitioner. This closed and completed the second transaction, with which we are particularly concerned here. We think there can be no doubt that the assignment and transfer of the Union Building and underlying sublease to the Upper Euclid Company constituted a "sale or exchange" of the property by petitioner, within the meaning of that term as used in section 117 (d), supra. See , and . affirmed per curiam . If petitioner's contention is sound that when it paid the amount of $235,000 on the principal of its own bonds at December 1, 1934, it paid the existing obligation by assumption of *164 the Investment Company (then and thereafter insolvent) the loss claimed would constitute a bad debt deduction. This raises the question of whether or not petitioner's declaration of forfeiture under the rental agreement between petitioner and the Investment Company and petitioner's repossession of the property thereunder, terminated the contract and relieved the Investment Company of further liability of its assumption, or whether the lease contract was terminated only in respect of petitioner. From a careful reading of the instrument, we can find no provision which we think would support petitioner's argument that there was a continuing liability thereafter on the part of the Investment Company to pay any additional amount of principal or interest on petitioner's bonds, or to reimburse petitioner for such payment. Certainly the Investment Company was not obligated to continue payments for rentals, taxes, or other expenses, and petitioner does not so contend. There is no provision for a continuing liability in respect of the bonds. However, in the view we take of the problem, the answer to that question is not of controlling importance. Assuming without deciding that the contractual *165 liability of the Investment Company was a valid, legal obligation after forfeiture and reacquisition of the property by petitioner on August 27, 1931, and that petitioner might have had recourse against the Investment Company, the fact remains that the only possible conclusion is that the property belonged to petitioner from and after the date of the forfeiture and repossession, and that the cost of the property to petitioner was the unpaid balance of its mortgage notes, plus petitioner's obligations under the sublease. When petitioner thereafter paid the balance due on its notes in the amount of $235,000, such amount became the sum of the bases of the two properties for capital gain or loss in respect thereof, but since no transfer of either of the properties in question was made by petitioner in its taxable year 1935 there was no such gain or loss realized in that year. Decisions will be entered under Rule 50. Footnotes
1. (f) Taxes of Foreign Subsidiary. - For the purposes of this section a domestic corporation which owne a majority of the voting stock of a foreign corporation from which it receives dividends * * * in any taxable year shall be deemed to have paid the same proportion of any income, war-profits, or excess-profits taxes paid by such foreign corporation to any foreign country or to any possession of the United States, upon or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits. * * *↩